UNITED STATES DISTRICT COURT
DISTRICT OF MASSACHUSETTS

| | | |
|---|---|---|
| UNITED STATES OF AMERICA | ) | |
| | ) | |
| v. | ) | CRIMINAL NO. 22-10205-NMG |
| | ) | |
| LI WEN TANG, | ) | |
| | ) | |
| Defendant | ) | |

GOVERNMENT'S SENTENCING
MEMORANDUM

The government respectfully submits this memorandum in support of its recommendation that the Court sentence the defendant to 87 months in prison, three years of supervised release, a $200 special assessment, restitution, and forfeiture as alleged in the indictment.

The Offense Conduct

The Presentence Report ("PSR") contains summaries of the robberies, part of which are set forth below.

Brookline Robbery

On the evening of June 12, 2022, [the defendant], Alfeu Barbosa ("Barbosa"), and Jonas Nunez ("Nunez") parked at the corner of Orkney Road and Ayr Road in Brighton in Nunez's Porsche Cayenne. Shortly before 8:45 p.m. the defendant walked down Ayr Road and entered the Balance Reflexology Spa (the "Brookline Spa") located at 1908 Beacon Street in Brookline, Massachusetts. He first went to the bathroom and then returned to the lobby. The only person present was an employee (the "victim"). [The defendant] paid $60 for one hour of bodywork and then went to the bathroom again, taking his phone with him. When he came out he wanted to know whether anybody else was there. The victim felt uncomfortable and told [the defendant], untruthfully, that there was another

employee present.  [The defendant] wanted to see her, but the victim said that she was busy.  PSR ¶ 6.

[The defendant] went into the room for bodywork and got undressed for the session.  The victim entered and had just begun to perform the bodywork when [the defendant] said he needed to go to the bathroom again.  He did so, again taking his phone with him.  The victim, who continued to feel uncomfortable, locked the door to the spa.  [The defendant] returned to the room and when the victim entered a short while later [the defendant] was dressed.  He said he no longer wanted the bodywork and wanted a refund.  The victim said she would have to call her boss and they returned to the lobby area.  As the victim was making the call, [the defendant] unlocked the door.  PSR ¶ 7.

At that time Barbosa and Nunez entered.  Each was wearing a facemask and either a hood or a hat, and each of them had a handgun.  One of them slapped the cell phone out of the victim's hand and then hit her either in the face or the mouth.  She ended up on the floor and one of them put a gun to her head.  She was dragged to the back of the spa by her hair.  They kept demanding to know where the money was.  The victim showed them, and they took approximately $500 in cash.  The victim was bound with duct tape around her wrists and ankles and was also gagged with a length of duct tape.  PSR ¶ 8.

The group then ransacked the spa for about three minutes.  As they were leaving, they took the victim's cell phone.  The victim sustained bruises on her wrists and forearms as well as a cut on the inside of her left cheek.  An EMS unit and the Brookline Fire Department arrived to evaluate the victim.  She declined further medical attention.  PSR ¶ 9.

Stoneham Robbery

Nunez and Barbosa were unhappy with the proceeds from the Brookline robbery and [the defendant] indicated there was another spa they could rob.  It turned out to be May's Spa, located at 66

2

Montvale Avenue in Stoneham, Massachusetts. While driving there in Nunez's Porsche, they placed a call using the defendant's VoIP number to make sure the spa was still open. When they arrived, it was determined that they needed additional help for the robbery and Barbosa placed a call to get assistance. Not long thereafter a Jeep arrived with three people in it. [The defendant], who was familiar with the spa, provided information regarding the interior set-up and the number of employees who might be present[.] [O]ne of the men who arrived in the Jeep went into the spa with Barbosa and Nunez at approximately 10:00p.m. All three were wearing masks and either hats or hoods. Barbosa and Nunez were carrying handguns. Two men and four employees, one of whom owned the spa, were present. The robbers took about $500 from a male client, about $600 from the spa's register, and three cell phones. The robbers bound all of the victims with duct tape. One of the male victims had some bruising on his arms, one of the female victims had some marking on her wrists, and another of the female victims had a large scratch on her right wrist[] and a smaller scratch on the heel of her left palm. None of the victims received medical treatment.

The Guidelines

The government agrees with the following calculation of the guidelines sentencing range ("GSR") for the two robberies.

Brookline Robbery

Base offense level of 20. USSG § 2B3.1(a), PSR ¶ 18.
6 additional levels are added because a firearm was "otherwise used." USSG § 2B3.1(b)(2)(B), PSR ¶ 19.
2 additional levels are added because a person was physically restrained to facilitate commission of the offense or to facilitate escape. USSG § 2B3.1(b)(4)(B), PSR ¶ 20
Resulting adjusted offense level: 28. PSR ¶ 24.

<u>Stoneham Robbery</u>

Base offense level of 20. USSG § 2B3.1(a), PSR ¶ 25.

5 additional levels are added because a firearm was brandished or possessed.  USSG § 2B3.1(b)(2)(C), PSR ¶ 26.

2 additional levels are added because people were physically restrained to facilitate commission of the offense or facilitate escape.  USSG § 2B3.1(b)(4)(B), PSR ¶ 27.

Resulting adjusted offense level: 27.  PSR ¶ 31.

<u>Combined Offense Level</u>

Pursuant to USSG § 3D1.4, each robbery constitutes a "Group"; the Brookline Robbery, as the Group with the highest adjusted offense level, is assigned 1 Unit; and the Stoneham Robbery, as a Group with an adjusted offense level within 4 levels as serious as the Brookline Robbery, is also assigned 1 Unit.  The total of two Units results in 2 levels being added to the Group with the highest adjusted offense level to achieve the combined adjusted offense level of 28 + 2, or 30.  PSR ¶¶ 32-35.

<u>Total Offense Level</u>

Because the defendant has accepted responsibility for the offenses, the combined adjusted offense level is decreased by a total of 3 levels, for a total offense level of 27.

<u>Criminal History Category</u>

The defendant has one criminal conviction.  PSR ¶ 42.  On January 25, 2018, he was convicted of keeping a house of illegal prostitution and of money laundering/possessing or transporting monetary instruments.  *Id.*  He received sentences of 18 months, ordered to run concurrently with one another. *Id.*  He accordingly receives 3 criminal history points for having a prior sentence of imprisonment exceeding one year and one month, which, according to the Sentencing Table in Chapter Five, Part A, places him in criminal history category ("CHC") II.  PSR ¶¶ 43-44.

4

<u>Guidelines Sentencing Range</u>

Based on a total offense level of 27 and a CHC of II, the defendant's GSR is 78-97 months.

<u>The Defendant's Objections</u>

The defendant submitted four objections to the draft PSR – Objections 1(a), 1(b), 1(c), and 2 – which were rejected in the final PSR.  The government agrees with the Probation Officer that the objections are without merit.

<u>Objection 1(a)</u>

The defendant's first objection is that "for the points enhancement from this act to be applied to Mr. Tang, there must be a preponderance of the evidence that it was 'reasonably foreseeable' to Mr. Tang that one of his co-defendants would "otherwise use" a firearm.  There is insufficient evidence that this information was reasonably foreseeable to Mr. Tang."  PSR at 22.

The defendant relies for this position in part on his mistaken belief that his codefendant testified at trial that "he and Mr. Tang had committed several robberies/thefts before this incident and never taken a firearm."  The earlier robberies to which the defendant refers were robberies of apartments in which massages/sexual favors were being provided that the defendant asked the codefendant to participate in.  Trial Transcript, Day 4 ("Tr.") at 12-14.  The codefendant was asked whether initially a weapon was being used and he responded, "Initially, no, but ended up yes.  As we progressed, he [the defendant] told me, bring a firearm, just to intimidate though.  It was never loaded."  Tr. at 14.  At that point the defendant started bringing a black semi-automatic firearm to the robberies.  *Id.*  Accordingly, the codefendant's trial testimony supports, rather than undercuts, the PSR's position that it was reasonably foreseeable to the defendant that the codefendant would be armed for both the Brookline Robbery and the Stoneham Robbery, because it was he who requested the codefendant to bring the

5

firearm.

The PSR also notes that "[i]n this case, the defendant used the Brookline spa restroom, several times as a ruse to communicate with the co-conspirators via cellular phone which is reflective of him knowingly engaging in jointly undertaken criminal activity." PSR at 22. This position is corroborated by text messages between the defendant and the codefendant when the defendant was inside the spa and the codefendant was attempting to find out from the defendant how many people were present and when he and Barbosa should enter. This series of text messages was introduced as Exhibit 60 ("Exh. 60") at Barbosa's trial and is attached hereto.[1] The messages begin at 8:44:37 p.m. with the defendant telling the codefendant, "2 here come," a reference to how many other people he thought were in the spa. This is consistent with and corroborates the victim's version, as reflected in the PSR, that she untruthfully told the defendant that there was another worker in the spa. At 8:44:51 the codefendant asked, "No body els [sic] just them two???" The defendant did not respond immediately to the codefendant or to several other messages he sent trying to find out what was happening. Eventually at 8:48:03 the defendant said, "Come in now," followed by a message to the codefendant at 8:49:22 saying, "I think one guy is here a customer." The defendant's belief that a male might be present was likely owing to the victim's claim that the other employee was "busy," from which the defendant inferred that she was probably with a customer. At 8:49:30 the codefendant told the defendant "It's locked," referring to the fact that the door was locked. The defendant indicated that he would "come

---

[1] While the text messages indicate they took place on June 13, 2022, the times are provided in Coordinated Universal Time, or "UTC." Massachusetts was in Eastern Daylight Time when the robberies occurred, and to determine what time it was in Massachusetts at the time a particular text message was sent, one must subtract 4 hours from the time associated with the text message. Thus, when the defendant sent the text message saying "2 here come," it was 8:44:37 p.m. on June 12, 2022 rather than 12:44:37 on June 13, 2022.

out" but did not respond immediately to several other text messages.  At 8:51:13 he said, "Get ready." At 8:51:57 the codefendant told the defendant, "We at the doors," and five seconds later asked, "Where you at."  The defendant apparently unlocked the door at this point as this series of text massages ends at this point.[2]

These messages, again, confirm the Probation Officer's observation that the cell phone communications demonstrate the defendant's knowing involvement in jointly undertaken criminal activity.  One of his main tasks clearly was to let the codefendant and Barbosa know how many people were present and therefore what sort of resistance they might expect when they entered to carry out the robbery.  His statement that he thought "one guy" was there served the same purpose.  Given that the codefendant started bringing his firearm to the earlier robberies at the defendant's request, and given that the defendant wanted the firearm to start being used for "intimidation" during the robberies, not only was it reasonably foreseeable to the defendant that firearms would be used for the robberies at issue here, but it is virtually inconceivable that he did not expect and know that they would be used.

In addition, the codefendant testified he had never met Barbosa until the day of the robberies. Tr. at 16-17.  He testified that while he and the defendant were driving to the Brookline spa, the defendant told him that he had "a friend" who was going to participate in the robbery.  *Id.* at 16.  It is highly unlikely that the two people who were enlisted by the defendant to participate in the robbery and who did not know one another independently took it upon themselves to bring firearms.  It is far more likely the defendant, as he had done previously with the codefendant, told Barbosa to bring a firearm, and that he fully expected and understood that firearms would be used to intimidate anyone who was

---

[2] The codefendant explained the text messages during his testimony.  Tr. at 33-40.

present.

Finally, the defendant clearly would have seen the firearms when he unlocked the door of the Brookline Spa to let the robbers in.  As the Probation Officer points out, the defendant helped plan the Stoneham Spa robbery without objecting to the use of firearms, further evidence that he knew and expected them to be used.  *See* PSR at 22.

Objection 1(b)

The defendant's next objection is that "the unloaded gun should be considered a dangerous weapon" rather than a firearm.  PSR at 23.  As the Probation Officer noted, however, the term "firearm" is defined for purposes of the guidelines as:

> … (i) any weapon (including a starter gun) which will or is designed to or may readily be converted to expel a projectile by the action of an explosive; (ii) the frame or receiver of any such weapon; (iii) any firearm muffler or silencer; or (iv) any destructive device.  A weapon, commonly known as a "BB" or pellet gun, that uses air or carbon dioxide pressure to expel a projectile is a dangerous weapon but not a firearm.

USSG § 1B1.1, comment. (n.1(H)); *see also* PSR at 23.

The defendant does not maintain that the weapon in question was not actually a firearm but instead posits that because there is no possibility of anyone actually being shot when a firearm is unloaded it should instead be downgraded to a dangerous weapon.  *See* PSR at 23.  However, the relevant definition of firearm makes no such exception.  The Commission clearly understood how to exclude certain weapons from the definition of "firearm" when it did so with respect to BB/pellet guns.  It did not do so with respect to unloaded firearms, and therefore, by the plain language of the definition, the defendant is subject to the offense level adjustments for firearms rather than dangerous weapons.

8

Objection 1(c)

The defendant's third objection is that, with respect to the Brookline robbery, the evidence shows that a firearm was "brandished or possessed," qualifying for an increase of 5 levels to the adjusted offense level, rather than "otherwise used," which qualifies for a 6-level adjustment.  The government again agrees with the Probation Officer that a firearm was "otherwise used.".

Under the guidelines, the term "brandished" is defined as follows:

> ***"Brandished"*** with reference to a dangerous weapon (including a firearm) means that all or part of the weapon was displayed, or the presence of such a weapon was otherwise made known to another person, in order to intimidate that person, regardless of whether the weapon was directly visible to that person.  Accordingly, although the dangerous weapon does not have to be directly visible, the weapon must be present.

USSG § 1B1.1, comment. (n.1(C)).   The term "otherwise used" is defined as follows:

> ***"Otherwise used"*** with reference to a dangerous weapon (including a firearm) means that the conduct did not amount to the discharge of a firearm but was more than brandishing, displaying, or possessing a firearm or other dangerous weapon.

USSG § 1B1.1, comment. (n.1(J)).

The defendant cites two cases in support of his contention that the evidence shows at most that a firearm was brandished rather than otherwise used: *United States v. Johnson,* 931 F.2d 239, 240-41 (3d Cir. 1991), and *United States v. Seavoy,* 995 F.2d 1414, 1422 (7th Cir. 1993).  PSR at 23.  The defendant contends, in essence, that both cases stand for the proposition that merely pointing a firearm at a victim without a simultaneous threat does not rise to the level of "otherwise us[ing]" a firearm.

Both *Johnson* and *Seavoy* were decided under an earlier definition of brandishing, which provided that "brandished" meant that the weapon was "pointed or waived about, or displayed in a threatening manner."  *See United States v. Villar,* 586 F.3d 76, 89 n.7 (1st Cir. 2009).  As the First

Circuit observed in *Villar,* under the earlier definition, the First Circuit, in *United States v. LaFortune,* 192 F.3d 157 (1st Cir. 1999), had drawn the line between "brandishing" and "otherwise us[ing]" a weapon during a robbery as follows:

> As we view it, a person may "brandish" a weapon to "advise" those concerned that he possesses the general ability to do violence and that violence is imminently and immediately available. A general, or even pompous, showing of weapons, involving what one would consider an arrogant demonstration of their presence, constitutes the generalized warning that these weapons may be, in the future, used and not merely brandished. Altering this general display of weaponry by specifically leveling a cocked firearm at the head or body of a bank teller or customer, ordering them to move or be quiet according to one's direction, is a cessation of "brandishing" and the commencement of "otherwise used."

*Villar,* 586 F.3d at 89, quoting *LaFortune,* 192 F.3d at 161-62 (finding that a defendant "otherwise used" a weapon by pointing a gun at bank tellers and customers, telling them to get down). The *Villar* court also cited with approval cases from other circuits to like effect. *See Villar,* 586 F.3d at 90, citing *United States v. Cover,* 199 F.3d 1270, 1278-79 (11th Cir. 2000) (concluding that, under pre-2000 guidelines, "the use of a firearm to make an explicit or implicit threat against a specific person constitutes the 'otherwise use' of the firearm"); *United States v. Wooden,* 169 F.3d 674, 676 (11th Cir. 1999) (holding a semi-automatic handgun one-half inch from victim's head constitutes "otherwise use" of the weapon); *United States v. Yelverton,* 197 F.3d 531, 534 (D.C. Cir. 1999) (stating the majority view that the "key consideration [about 'otherwise use'] is whether a gun … was pointed at a specific person in an effort to create fear so as to facilitate compliance with a demand, and ultimately to facilitate the commission of the crime").

      The court noted in *Villar* that the change in the definition of "brandished" did not undermine the First Circuit's holding in *LaFortune* that the "specific[] leveling" of a weapon at another person as

opposed to a "general display of weaponry" is the demarcation between "brandishing" and "otherwise use." *Villar*, 586 F.3d at 90. Citing *LaFortune,* 192 F.3d at 161.  The First Circuit observed that the reasoning in *LaFortune* is fully consistent with the amended version of the "brandishing" definition, which is the definition at issue here.

Based on the foregoing, the Probation Officer's determination that the evidence underlying the Brookline robbery satisfies the "otherwise used" definition is correct.  A specific person – the victim -- had a firearm put to her head, which involved the "specific leveling" of a firearm at another person as opposed to the "general display of weaponry."

Objection 2

The defendant's fourth objection is that the PSR incorrectly adjusts his offense level for the Stoneham robbery by 5 levels pursuant to USSG § 2B3.1(b)(2)(C) for brandishing or possessing a firearm.  *See* PSR at 24.  In so doing he incorporates by reference his argument that it was not reasonably foreseeable to him that either the codefendant or Barbosa would have firearms and the firearms at issue here should be considered dangerous weapons because they were not loaded.  For the same reasons set forth above, these claims should be rejected.

Recommendation

The government recommends that the Court impose a sentence of incarceration of 87 months, which is in the middle of the advisory GSR of 78-97 months; a three-year term of supervised release; a $200 special assessment; restitution; and forfeiture as alleged in the indictment.  The salient sentencing factors set forth at 18 U.S.C. § 3553(a) are discussed below.

**The need for the sentence to reflect the seriousness of the offense, to promote respect for the law, and to provide just punishment for the offense – 18 U.S.C. § 3553(a)(2)(A)**

The defendant participated in robberies in which victims were violently assaulted with firearms and restrained with duct tape.  The conduct toward the victim of the Brookline robbery was particularly brutal and abhorrent: she had a cell phone slapped out of her hand, was hit in the face or mouth, had a gun put to her head, and was dragged by the hair before being bound and gagged with tape.  In committing these robberies the defendant and his cohorts preyed on and terrorized innocent, vulnerable victims.  A significant sentence is necessary to reflect the seriousness of this conduct, to promote respect for the law, and to provide an appropriate sanction for the offenses.

**The need for the sentence to afford adequate deterrence to criminal conduct – 18 U.S.C. § 3553(a)(2)(B)**

This is the defendant's second conviction for serious offenses in the space of approximately six and one-half years.  In committing this new set of crimes, the defendant did not simply fail to learn from his first convictions: he graduated to even more serious violent crimes involving firearms.  A significant sentence is warranted to deter him from committing future crimes.  It is also necessary to deter others similarly situated from engaging in such conduct.

**The need for the sentence to protect the public from further crimes of the defendant – 18 U.S.C. § 3553(a)(2)(C)**

Given the defendant's failure in the past to refrain from further criminal conduct following convictions for serious crimes, a significant sentence is needed to protect the public from further crimes of the defendant.

**The need to avoid unwarranted sentence disparities among defendants with similar records who have been found guilty of similar conduct – 18 U.S.C. § 3553(a)(6)**

The recommended sentence of 87 months is in the middle of the advisory GSR.  Although

some of the average and median sentences available through the Judicial Sentencing Information for people whose primary guideline was § 2B3.1 and who had a final offense level of 27 and a CHC of II were lower than the recommended 87-month sentence, the average sentence for the 26 defendants who received a sentence of imprisonment in whole or part was 84 months, which is close to the recommended sentence.  In addition, as a sentence within the advisory GSR, it is a sentence that would help to avoid unwarranted sentencing disparities.  A sentence in the middle of the GSR is appropriate in this case both due to the savagery visited upon the victims, and particularly the victim of the Brookline robbery, and the use of firearms.

<u>CONCLUSION</u>

For the foregoing reasons, the government respectfully recommends that the Court impose a sentence of 87 months in prison, three years of supervised release, a $200 special assessment, restitution, and forfeiture as set forth in the indictment.

Respectfully submitted,

JOSHUA S. LEVY
Acting United States Attorney

By:

<u>/s/Robert E. Richardson</u> LUKE
GOLDWORM
ROBERT E. RICHARDSON
Assistant U.S. Attorneys

## <u>CERTIFICATE OF SERVICE</u>

I, Robert E. Richardson, hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing (NEF) and paper copies will be sent to those indicated as non-registered participants on August 9, 2024.

/s/Robert E. Richardson
ROBERT E. RICHARDSON
